**RECORD NO. 15-1384**

## IN THE

# United States Court of Appeals

### FOR THE FOURTH CIRCUIT

---

JOTAYNUN LEE, Individually, and on behalf of himself and the minor children of Jataynun Trayvon Fleming, Deceased, and as Administrator of the Estate of Jataynun Trayvon Fleming, Deceased,

*Plaintiff-Appellant,*

v.

TODD JAMES BEVINGTON,

*Defendant-Appellee*,

and

CITY OF RICHMOND, VIRGINIA; WESLEY E. MOORE; JOHN DOE, Nos. 1-20, being members of the Richmond Police Department SWAT Team who decedent at 304 Beaufort Hill Drive, Richmond, VA 23225; JOHN DOE, Nos. 11-20, being United States Marshals Service members who were part of the response team that shot at decedent

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

---

## OPENING BRIEF OF APPELLANT

---

John B. Mann
JOHN B. MANN, P.C.
Suite 200
2201 Libbie Avenue
Richmond, Virginia 23230
(804) 673-6600 Telephone
jmann@canfieldbaer.com

K.C. Okoli
LAW OFFICES OF K.C. OKOLI, P.C.
330 Seventh Avenue, 15th Floor
New York, NY 10001
(212) 564-8152 Telephone
Kcokoli@verizon.net

*Counsel for Appellant*

*Counsel for Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.      Does party/amicus have any parent corporations?                          YES     NO
        If yes, identify all parent corporations, including grandparent and great-grandparent
        corporations:



3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                          YES     NO
        If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?     YES     NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)     YES     NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?     YES     NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____          _____
(signature)                                              (date)

- 2 -

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES ........................................................ iii

PRELIMINARY STATEMENT ......................................................1

JURISDICTIONAL STATEMENT ..................................................4

STATEMENT OF THE ISSUES....................................................4

STATEMENT OF THE CASE........................................................5

    I.    Nature of the Case ........................................................5

    II.   Course of Proceedings and Disposition Below..................9

STATEMENT OF FACTS .........................................................10

SUMMARY OF ARGUMENT .....................................................17

ARGUMENT ........................................................................19

POINT I:
The District Court Improperly Granted Summary
Judgment under the Facts and Circumstances of this Case ....................................19

    Standard of Review for Grant of Summary Judgment ................................19

Assuming that Bevington's First Volley of Shots Could be
Justified there is No Justification for the Second Volley of Shots ........................23

POINT II:
Appellee is Not Entitled to Qualified Immunity.......................................26

    Standard of Review for Qualified Immunity Determination.........................26

CONCLUSION .................................................................................................... 31

REQUEST FOR ORAL ARGUMENT ................................................................. 31

CERTIFICATE OF COMPLIANCE .................................................................... 32

CERTIFICATE OF SERVICE .............................................................................. 33

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................22

*Brockington v. Boykins*,
   637 F.3d  503 (4th Cir. 2011) ........................................................25

*Gray v. Spillman*,
   925 F.2d 90 (4th Cir. 1991) ............................................................22

*Harlow v. Fitzgerald*,
   457 U.S. 800 (1982)..........................................................................26

*Hopkins v. Andaya*,
   958 F.2d 881 (9th Cir. 1992) ..........................................................27

*Jacobs v. N.C. Admin. Office of the Courts*,
   780 F.3d 562 (4th Cir. 2015) ...................................................19, 20

*Pethel v. West Virginia*,
   568 F. Supp. 2d 658 (N.D.W.Va. 2008)...................................25-26

*Sevigny v. Dicksey*,
   846 F.2d 953 (4th Cir. 1988) ..........................................................30

*Taylor v. Farmer*,
   13 F.3d 117 (4th Cir. 1993) ............................................................26

*Thomas v. Great Atlantic & Pac. Tea Co.*,
   233 F.3d 326 (5th Cir. 2000) ..........................................................19

*Tolan v. Cotton*,
   134 S. Ct. 1861 (2014)..............................................................19, 20

*United States v. Wilhem*,
   80 F.3d 116 (4th Cir. 1996) ............................................................26

*Waterman v. Batton*,
   393 F.3d 471 (4th Cir. 2005) ........................................................................24

*Wilson v. Kittoe*,
   337 F.3d 392 (4th Cir. 2003) ........................................................................26

## STATUTES

28 U.S.C. §1291 ...............................................................................................4
28 U.S.C. §1331 ...............................................................................................4
28 U.S.C. §1343(a)(3) .......................................................................................4
28 U.S.C. §1343(4) ...........................................................................................4
42 U.S.C. §1983 ..............................................................................................25

## PRELIMINARY STATEMENT

The District Court, by its grant of summary judgment to Richmond police detective Todd James Bevington ("Bevington" or "Appellee") in this case, showed a clear misapprehension of the summary judgment standards, and created a very dangerous precedent indeed. Despite the District Court's correct articulation of the standard of review, the District Court, in fact, viewed the evidence in the light most favorable to Bevington, the moving party, and credited Bevington's evidence despite the contradictory or inconsistent evidence in the record.

The District Court also made many factual conclusions which are incorrect. For example, the District Court concluded that Bevington's testimony is supported by Sergeant McQuail's internal affairs interview that "one of Fleming's arms was rolled up in a shirt or towel and that, after the encounter, McQuail saw a black shoe laying on the floor in the master bedroom. McQuail Interview at 12-14, Docket No. 188-15." (Memorandum Opinion at 8-9, Dkt. 193, JA 1282-1283). First, McQuail was inconsistent in his own statements; he made a statement to police investigators on the night of the shooting which he later changed in his declaration submitted in support of Appellee's motion for summary judgment. McQuail claimed that as soon as the shooting ended, he grabbed one of Fleming's arms and Musselwhite grabbed the other "and we handcuffed em." (JA 1257). McQuail later changed his story in his

1

declaration where he stated that he did not personally handcuff Fleming but only "assisted" unidentified "fellow officers" in doing so. (McQuail Decl., ¶5, JA 1253). Secondly, both of McQuail's statements are contradicted by those made to police investigators on the night of the shooting by Charles Hayes and Michael Musselwhite, the two arrest team members specifically assigned the task of securing Fleming and who immediately handcuffed Fleming as soon as the shooting ended. Moreover, at no time did McQuail claim that he ever saw Fleming let alone anything in Fleming's hand *before or during the* shooting. *See footnote 1* below.

With regard to the facts in the record, not only is the District Court's recitation of those facts slanted against the Appellant, some of the Court's statement of the facts are not supported at all by the record. For example, the Court stated in footnote 4 of the Memorandum Opinion as follows: "All other testimony from those at the scene confirms that Fleming was advancing toward the officers." (JA 1281). This statement is critical to the Court's decision and is factually incorrect. Only the Appellee and Officer Moore – the two police officers who shot at Fleming - testified that Fleming was advancing towards the officers. None of the other SWAT team members who were all present at the scene ever stated that they saw Fleming *advancing toward* the officers. Indeed, according to all other testimony from those at the scene, none of them ever saw Fleming from the time that Fleming exited the

bathroom until Fleming was on the master bedroom floor after the shooting ended. The District Court also stated that officers were present at the home to arrest Fleming "…for his involvement in a homicide that had been committed earlier that morning." (Dkt. 193, 1-2, JA 1275-1276). There is absolutely no proof that Fleming was involved in any homicide, and the District Court knows the difference between "alleged involvement" and "involvement." The Memorandum Opinion is replete with many more such incorrect recitation of the facts, improper inferences against the Appellant and slanted views of the evidence.

According to the decision of the District Court in this case, a police officer may shoot an unarmed suspect dead inside his home, and when sued for violating the decedent's civil rights escape liability by simply contending that the decedent pointed an object at him, which the officer believed was a gun, making the officer fear for his life and, because t*here was no direct eyewitness* to contradict him that the decedent pointed an object at him despite: 1) evidence in the record which is inconsistent with the officer's version of events; 2) *circumstantial evidence* which contradicts the officer's claim that the decedent had an object in his hand pointed at the officer; and 3) inconsistencies in the testimonies of the officer and various police eyewitnesses on a critical issue.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this matter under 28 U.S.C. §§1331 and 1343(a) (3) and (4).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291. This is an appeal from a final Order of the District court. The District Court issued an Opinion and Order (Dkt. 193, JA 1275-1311), granting summary judgment and dismissing the Complaint on March 18, 2015. Appellant timely filed a Notice of Appeal on April 10, 2015. (Dkt. 197, JA 1313-1314).

## STATEMENT OF THE ISSUES

1.  Is this Court's standard of review of the District Court's grant of summary judgment *de novo?*

2.  Whether, in reviewing Bevington's motion for summary judgment in this matter, the District Court in fact properly applied the applicable standard of review?

*3.*  Whether the District Court, in fact, took *the record as a whole*, and interpreted the facts and evidence *in the light most favorable to plaintiff as the non-moving party?*

4.  Whether, under the conflicting and disputed facts of this case, the

4

District Court was correct in concluding that qualified immunity shielded Bevington from liability in the death of Fleming?

5.    Whether the District Court was correct in precluding the expert testimony of Dr. Kenneth Okafor

## STATEMENT OF THE CASE

### I.    Nature of the Case

This action involves the use of deadly force by the police. The police came to the family home of Appellant in which his decedent son, Fleming, for the purpose of effecting Fleming's arrest on a warrant for armed robbery and in connection with his alleged involvement in a homicide which occurred that morning. Fleming had never been convicted or any violent offense or armed robbery in his life.

Fleming barricaded himself inside the family master bedroom bathroom. Police claimed that Fleming who was unarmed inside the bathroom threatened to shoot the police if anyone came in to get him. Lee told the police that his son did not have a gun inside the home; there was no gun in the home. There was heavy police presence around the home and SWAT team members were staging inside, including Todd James Bevington. The police attempted to get Fleming to come out of the master bathroom and surrender to the police but were unsuccessful. After

5

approximately three hours of negotiations, the police fired two canisters of chemical tear gas into the master bathroom for the purpose of forcing Fleming out. Officer Wesley Moore, the SWAT shield man who was closest to the bathroom heard Fleming coughing. A few moments after, Fleming fled the bathroom into the master bedroom where he was immediately shot once by Moore and began to fall to the master bedroom floor. Following Moore's gunshot, Appellee fired a volley of shots from his semi-automatic rifle. Appellee fired a *second volley of shots at Fleming while Fleming was on the master bedroom floor,* making total of eight gunshots.

According to Bevington, he, Moore and their fellow SWAT colleagues were in a room across the hallway from the master bedroom – a room which was about 13 feet away at a sharp angle from the door of the master bathroom door. Fleming did not know where Bevington and the SWAT were staging within the home because he had barricaded himself inside the master bathroom before Bevington and the SWAT team arrived at the location, entered the home and took their positions. Bevington claimed that Fleming, who had just been subjected to the effect of two canisters of tear gas in an enclosed bathroom space, came out *rushing directly towards him* while pointing an object wrapped in a cloth to look like a gun.

Bevington testified that he believed that the object he saw wrapped in Fleming's hand was a gun because he had earlier been told that Fleming had made

several statements suggesting that he had a gun inside the master bathroom, including that he would shoot the police and their dog if they came to get him. It was at this very point that Appellee and Officer Moore who was the shield man feared for their lives. Moore fired once at Fleming from his service pistol. His shot struck Fleming and lodged in the wall of the master bedroom. According to Bevington, he fired his *first volley of shots* from his M4 rifle at Fleming who was still advancing towards them. *None of the gunshots fired by Appellee as Fleming allegedly advanced toward him struck any wall inside the home.* All of Appellee's shots struck the *master bedroom floor* and ended up in the kitchen below except the ones recovered from inside Fleming during autopsy.

Fleming fell to the master bedroom floor from this barrage of initial gunfire. According to Appellee, while on the master bedroom floor, Fleming continued to point the object in his hand at Appellee while at the same time attempting to get up. This alleged action on the part of Fleming caused Appellee to fire the *second volley of shots* at Fleming until Fleming was no longer a threat. Two of the SWAT members were designated "Arrest Team" with the specific task of securing Fleming. They immediately handcuffed Fleming as soon as the shooting stopped while other team members conducted a sweep of the home. These two were Charles Hayes and

Michael Musselwhite who did not see any cloth wrapped around Fleming's hand.1

Despite the severe gunshot injuries which Fleming sustained to both his hands

during the shooting, there is no visible sign of any blood stain, bullet holes or any

kind of damage to the high-heeled lady's shoe which Fleming supposedly was

pointing at Appellee during the shooting.

Fleming was removed from the scene to the hospital where he was later

pronounced dead. After Fleming was removed from the master bedroom, Appellee

and the SWAT team remained at the scene with unrestricted access to the master

bedroom and bathroom for some time before the RPD crime scene unit arrived to

conduct an investigation. The Richmond crime investigation unit was later called to

the scene to gather evidence and conduct an investigation. It was after the arrival of

---

1 Sgt. Stephen Mcquail, another SWAT team member who was not assigned the job of securing Fleming claimed, in his statement to police investigators on the day of Fleming's shooting, that it was **he and Musselwhite** who handcuffed Fleming when the shooting ended (JA 1257). It was this same officer who claimed to have observed some cloth fall from Fleming after he was shot. In a declaration which Sgt. McQuail provided in support of Bevington's motion for summary judgment well after the depositions of Musselwhite and Hayes identifying themselves as the only ones who secured Fleming after the shooting, McQuail "clarified" that he only "assisted" those who handcuffed Fleming *after* he was shot. With regard to this same t-shirt or towel allegedly wrapped around Fleming's hand before the shooting, Moore claimed that *after* the shooting, "We *actually had to unwrap* it to see what it was that was still wrapped up in his hand as he went down when we actually got to em." (Emphasis supplied) (JA 868). Hayes and Musselwhite contradicted this claim by Moore which creates a genuine issue as to whether Fleming posed a danger to Moore, Appellee and the SWAT team when Appellee short Fleming.

the crime scene unit that the first known photos of the scene were taken by anyone.

## II.    Course of Proceedings and Disposition Below

On June 27, 2012, Appellant, acting *pro se*, filed his Complaint in the United District Court for the Eastern District of Virginia, Richmond Division (Dkt. 1, JA 4). The Complaint was originally against the City of Richmond, Wesley Moore and Todd James Bevington. The City of Richmond was dismissed from this case earlier on (Dkt. 78). No appeal is taken against this dismissal. Wesley Moore was later dismissed from the case on summary judgment (Dkt. 192). Also no appeal is being taken against the grant of summary judgment to Moore. On October 25, 2012, Appellee Bevington, acting through counsel, filed an Answer to this Complaint (Dkt. 30, JA 6). Subsequently, Appellant, acting through counsel, filed an Amended Complaint (Dkt. 38, JA 31-43). Appellee then filed his Answer to the Amended Complaint (Dkt. 48, JA 44-61).

Fact discovery was commenced and concluded by the parties. Expert discovery was also conducted by both the Appellant and the Appellee. Over Appellant's objection, the District Court granted Appellee's motion to preclude the testimony of Dr. Kenneth Okafor, Appellant's expert on identification of Bevington's location at the time Bevington fired the undisputed shots which pierced

the master bedroom floor and ended in the kitchen below.

## STATEMENT OF FACTS

On July 14, 2014, Jotaynun Fleming, a 22 year-old African American, had barricaded himself inside the master bedroom bathroom in his father's home after law enforcement officers arrived at that location to execute a warrant for his arrest. (JA 33, ¶¶18-21 [Amended Complaint]; JA 56, ¶¶78, 79 & 80 [Answer to Amended Complaint]). Fleming was not holding anyone hostage and was not a threat to Bevington or anyone else while barricaded inside the master bathroom (JA 34, ¶¶25-28). Police began negotiations with Fleming in an attempt to get him to come out of the master bathroom and surrender to the police. At one point, Fleming even asked to speak with his father, Appellant Jotaynun Lee (JA 544, 955, ln 4-8). This request was denied as was the request of Fleming's grandmother, Maggie Lee, who could persuade him to surrender. After approximately 3 hours of unsuccessful negotiations to get Fleming to surrender, two canisters of tear gas were fired into the master bathroom to get Fleming out. (JA 868, 1010-1022). Fleming, who had a documented history of asthma, began to cough. (JA 868). Within 3 to 7 minutes of the deployment of chemical tear gas into the master bathroom where Fleming was barricaded, Fleming ran out of the master bathroom. (JA 961, ln 17-21).

10

What happened as Fleming exited the master bathroom is where the parties' seriously differ in their accounts and contentions in this action. Appellee's claim is that Fleming rushed out of the master bathroom with both hands clasping an object, which looked like a handgun wrapped in cloth, with both arms extended pointing the object at Bevington, as Fleming quickly advanced towards Bevington and his SWAT team mates who were in another bedroom across the hallway from the master bedroom about 14 feet away. (Bevington Dep. at 93:11-21; 94:9-19; 95:9-11, 99:13-19, JA 371, 372, 373 and 377; Moore Dep. at 68:18-25; 69: 1-8; 71:3-16, JA 404, 405 and 406).

This bedroom across the hallway was at such a sharp angle from the master bathroom door that a person at the threshold of the doorway of that bedroom could only see the *door knob* (not the door) of the closed master bathroom door (JA 773-774; 508-510, ¶¶17-24; 511, 513, ¶¶7-11, 518, ¶¶36, 37, 39). According to Bevington, it was as Fleming was quickly advancing towards him pointing what Bevington believed was a gun that both Moore and Bevington fired their weapons at Fleming.

Fleming did not immediately exit the master bathroom upon the deployment of chemical gas. It took a little while such that Appellee began to wonder why it was taking Fleming that long to exit the bathroom after the deployment of chemical gas.

11

(JA 650, ln 11-21). Charles Hayes, another SWAT member who was present at the time, estimated that it took between three minutes and seven minutes for Fleming to exit after chemical gas was deployed in the master bathroom (JA 961, ln 17-21). Dr. Philip Hayden, a Vietnam veteran, former FBI Special Agent and SWAT Team Leader, testified on the general effect that such chemical gas has on people; the coughing and burning sensation to the eyes which exposure so such chemical gas causes people, including himself. (JA 512, ¶¶3 & 4). This piece of evidence was not challenged by the Appellee. Indeed, before Fleming exited the master bathroom after the deployment of gas, Fleming began coughing (JA 868). This was a classic reaction to such chemical tear gas. It is not unreasonable to infer that Fleming also had burning sensation to his eyes at that very same time.

That was the setting in which, according to Appellee and Moore, Fleming rushed out advancing quickly towards them with both hands clasping what looked like a gun with arms outstretched pointing the object which they thought was a weapon at them. Moore gave a statement to police investigators on the night of the shooting concerning Fleming's very hands immediately after the shooting ended. He said: "…*We actually had to unwrap it* [Fleming's hand] to see what it was *that was still wrapped up in his hand as he went down* when we actually got to em." (Emphasis supplied) (JA 868). Moore was the only witnesses who testified to this

piece of fact. Moore is either flatly contradicted by other eyewitnesses at the scene or his account is inconsistent with the testimonies of those other eyewitnesses.

Both Charles Hayes and Michael Musselwhite were the SWAT team members *specifically assigned* the task of securing and handcuffing Fleming at the time of the shooting (JA 946). Their position is comparable to Moore being specifically assigned the task of shield man at the time of the shooting. At the time that Hayes and Musselwhite handcuffed Fleming, Hayes neither observed any cloth around Fleming's hand, nor did he see any shoe in Fleming's vicinity. (Hayes Dep., 70:22-71:6, JA 983-984). Nor, indeed, does Hayes recall ever seeing any shoe near the fallen Fleming, from the time he and Musselwhite handcuffed Fleming, until they took Fleming down to the ambulance waiting outside the home to transport him to the hospital. (Hayes Dep. 71:7-17, JA 984). Hayes further testified that he and Musselwhite went "directly to where we are supposed to go" i.e. to secure Fleming as Arrest Team members; that he was taking care of Fleming while others were doing their assigned duties. (JA 977).

Further testifying in regard to what was happening to Fleming in the immediate aftermath of the shooting, Hayes said: "Sir, Officer Moore didn't do anything: Myself and Officer Musselwhite were *the only ones at the suspect*." (Emphasis supplied) (JA 978). Hayes' testimony also belies the testimony of

13

Stephen McQuail, the SWAT sergeant whose version of events favoring Appellee the District Court improperly credited. (Doc. 193, JA 1282). McQuail had made a statement to police investigators that immediately after the shooting ended, he went into the master bedroom and grabbed Fleming's wrist telling him "Let me see your hands" and he grabbed one of Fleming's arms while Musselwhite grabbed the other "and we handcuffed em." (JA 1257). While doing so, he saw a "rolled up shirt or towel from underneath Fleming. Years after, McQuail "clarified" in a declaration which he provided in support of Appellee's motion for summary judgment herein that he did not personally handcuff Fleming but "assisted" unidentified "fellow officers" in doing so. (McQuail Decl., ¶5, JA 1253).

It is noteworthy that Officer Musselwhite who also provided a detailed statement to police investigators on the night of the shooting; he also provided deposition testimony in this matter. Musselwhite claimed, at his deposition, years after the incident, that when he and Hayes handcuffed Fleming, there was a "*white towel* or *light-colored towel (*as distinct from a grey t-shirt), but it was *on the ground next to the suspect **when I entered the room***." (Emphasis supplied) (Musselwhite Dep., 13:1-5, JA 892). This claim by Musselwhite three years after the fact, conflicts with his own statement to investigators on the very night of the shooting in which he did not mention any cloth at all. Musselwhite's statement is also inconsistent with

14

Stephen McQuail's version of where McQuail saw the t-shirt or towel supposedly in Fleming's possession at the time of the shooting. It is further inconsistent with Moore's statement in which Moore claimed that "We *actually had to unwrap* it…" i.e. he and other SWAT team mates.

Musselwhite did not tell police investigators who questioned him in a videotaped interview, on the night of July 14, 2010, that he had observed *a white or light-colored towel* or any cloth al all *on the ground next to* Fleming at the time that he and Hayes admittedly placed Fleming in handcuffs. (Musselwhite Dep., 13-18, JA 892-897). Musselwhite's explanation at his deposition for why he did not tell investigators about the piece of cloth is that he did not realize the significance of it until after his interview that night when he heard other officers at the police headquarters discussing it. Yet, Musselwhite who was interviewed by police investigators at the police headquarters and who heard this conversation about the cloth within the hour of his interview, did not go back to tell police investigators about this cloth, t-shirt or towel which he claimed to have seen next to the fallen Fleming on the master bedroom floor. (Musslewhite Dep. 16, JA 895). Musselwhite does not recall seeing any black high-heeled lady's shoe in the vicinity of Fleming during his handcuffing of Fleming *after the shooting ended.* (Musselwhite Dep., 16: 9-14, JA 895).

15

A device called a "throw phone" was used by police negotiators in their communications with Fleming while he was barricaded inside the master bathroom. This throw phone has both audio and video capabilities. (JA 1042-1044) The police negotiators could speak to and observe Fleming inside the master bathroom. Yet, not a single video recording of what Fleming was doing inside the master bathroom during that time, or an audio recording of his alleged many threats to shoot and kill the police was introduced into the record.

By his own admission, Appellee delivered his shots at Fleming in at least *two separate volleys*; the first volley of shots were delivered while Fleming was quickly advancing towards Appellee, and the second volley of shots were delivered while Fleming was already on the floor. (Bevington Dep.105-108 (JA 662-665; Hayes Dep. 61, JA 974). Bevington's rifle had three different settings: automatic, semi-automatic and single fire settings. Bevington had the setting of his rifle at the time of the shooting on semi-automatic which meant that he had to pull the trigger of his rifle for each bullet he fired i.e. eight times. (Bevington Dep., 88-89, JA 645-646). Appellee fired three times in his first volley of shots (JA 974).

16

# SUMMARY OF ARGUMENT

1. The District Court failed to properly apply the applicable standard of review for summary judgment motions which requires it to view the record, as a whole, and interpret the facts and evidence and draw all proper inferences in the light most favorable to the Appellant herein, as the nonmoving party to the motion. Indeed, the Court viewed the evidence in the light most favorable to the Appellee, and ignored evidence in favor of the Appellant which undermined or contradicted that of the Appellee.

2. The District Court improperly invaded the province of the jury by, in effect, conducting credibility assessments of the testimonies of the witnesses instead of drawing all appropriate inferences in favor of Appellant as the nonmoving party. Even if the Court were to believe that Appellant may not succeed at trial, it is still wrong for it to grant summary judgment,

3. The Court erred in holding that qualified immunity shielded Bevington from liability in this case because there are many disputed issues of fact which could affect the outcome of the case. The Court could not have properly granted summary judgment in the face of disputed facts. The Court further reached some conclusions which are either not supported by the facts or clearly contradicted by the evidence.

17

4. The Court improperly excluded the testimony of Appellant's expert wtiness, Dr. Kenneth Okafor.

5. There is unchallenged evidence in the record which shows that Appellee's expert, Matthew Noedel, told an incredible tale of how he took an important piece of laser equipment from Washington State to Virginia, which would help determine where Bevington was at the time he fired the shots that pierced the master bedroom floor and ended in the kitchen below. He then testified that he did not use it for that purpose because it was too cumbersome. Appellant contradicted Noedel on this point which raises issues about Noedel's credibility on this critical issue. (Noedel Dep. 85-86; Lee Declaration, JA 506-507). Appellee did not include in his reply papers a denial of the factual allegations of Appellant regarding what Noedel did at his home during his visit. Yet the District Court glossed over this important credibility issue, apparently disbelieving Appellant, and granted summary judgment.

# ARGUMENT

## POINT I

### The District Court Improperly Granted Summary Judgment under the Facts and Circumstances of this Case

**Standard of Review for Grant of Summary Judgment**

This Court reviews *de novo* a district court's grant of summary judgment and, in doing so, views the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party. *See Jacobs v. N.C. Admin. Office of the Courts,* 780 F.3d 562 (4th Cir. 2015).

The various versions of events during the critical encounter given by the eyewitnesses, including the Appellee, cannot all be correct; and they cannot all be reconciled with one another. Because these versions necessarily involve the credibility of key witnesses to the encounter, summary judgment is inappropriate. *Jacobs, id.,* at 576-577 ("Summary judgment is not appropriate when 'questions about the credibility of key witnesses loom large' and the evidence could permit the trier-of-fact to treat their testimony with 'skeptical scrutiny'" (ellipsis omitted) (quoting *Thomas v. Great Atl. & Pac. Tea Co*., 233 F. 3d 326, 331 (5th Cir. 2000))). This is such a case.

In *Jacobs, supra,* this Court cited and relied upon the Supreme Court decision in *Tolan v. Cotton,* 134 S.Ct. 1861 (2014), a case involving excessive force. In a 9-0

19

decision by the Supreme Court, it vacated the summary judgment granted to a police officer and reversed the affirmance of that judgment by the Fifth Circuit based on qualified immunity. The Supreme Court held that the Fifth Circuit "failed to view the evidence at summary judgment in the light most favorable to the plaintiff with respect to the central facts of the case." Just like in *Tolan* and *Jacobs,* the District Court in this case failed to view the evidence in the light most favorable to the plaintiff as the nonmoving party. In fact, the District Court in this case found some facts against the plaintiff which are not supported by the record. For example, the District Court found: "All other testimony from those at the scene confirms that Fleming was advancing toward the officers." (JA 1281). But this is incorrect and clearly affected the Court's view of the evidence in the case.

A calm view of the District Court's Memorandum Opinion shows that what the Court did was credibility assessments of the evidence of key witnesses. The Court either claimed that there was no evidence supporting plaintiff and that plaintiff was speculating on what Fleming was doing just before he was shot, or preferring the evidence in support of Appellee's position to that which supported Appellant's position.   It should have been the other way round. The Court should have credited any evidence which supported plaintiff's position. One example will suffice here. The Court credited McQuail's version of his interview with police investigators in

20

which he claimed that *he and Musselwhite* handcuffed Fleming and, during that process, he observed a cloth fall off Fleming. (JA 1257, 1282-1283). Never mind that later in the declaration which McQuail submitted in support of Appellee's motion for summary judgment herein, he changed his position materially: McQuail 'clarified' that he did *not* personally handcuff Fleming but "assisted" unidentified "fellow officers" (plural) in doing so. (McQuail Decl., ¶5, JA 1253).

The critical issue in this case is whether Fleming charged out of the master bathroom after the deployment of two canisters of chemical gas which caused him to begin coughing – a classic effect of such chemical gas – and advanced quickly towards Appellee, pointing what looked like a gun wrapped in cloth at Appellee. Dr. Hayden's expert declaration in this matter shows that such chemical gas causes those exposed to it to start coughing and feel a burning sensation to their eyes *which causes them to shut their eyes*. (Hayden Declaration, ¶¶3&4, JA 512). Appellee who put in reply papers to Appellant's opposition did not contradict Dr. Hayden on this issue.

Since it is undisputed that Fleming in fact started coughing after chemical gas was deployed into the bathroom where he was barricaded, it is not unreasonable to infer that, at that same time, Fleming was also feeling a burning sensation to this eyes which caused him to shut his eyes. Although we do not have the benefit of

21

Fleming's *direct* testimony as to whether he was feeling a burning sensation to his eyes which cause him to shut his eyes as he exited the bathroom, support for this conclusion is found in the *circumstantial* evidence provided by the fact that Fleming was coughing and Dr. Hayden's expert opinion that those exposed to such chemical gas often began coughing and feel a burning sensation to their eyes which causes them to shut their eyes. When the resolution of a material issue turns on the credibility of witnesses, as in this case, summary judgment is inappropriate, and the motion must be denied. *See Gray v. Spillman,* 925 F.2d 90, 95 (4th Cir. 1991). Credibility determinations are the responsibility of the jury and it is not for the judge at summary judgment stage to weigh the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Based upon these facts, the District Court should have drawn the reasonable inference from these facts that Fleming could not see where he was going to be advancing towards Appellee with a pointed object as Appellee testified to. The Court should also, on the facts, have drawn the inference that since Musselwhite and Hayes did not tell the police investigators on the night of the shooting that they saw any shoe or cloth nearby Fleming before they took Fleming downstairs to the waiting ambulance for transportation, the shoe seen in the photograph taken by RPD crime scene unit was placed by Appellee or Moore before the arrival of the crime

scene unit which took the photos. The upshot is that this is not a case for summary judgment. There are too many unanswered questions which militate against summary judgment in this case.


**Assuming that Bevington's First Volley of Shots Could be
Justified there is No Justification for the Second Volley of Shots**

It is undisputed that Moore fired only once and Appellee fired a total of 8 times in two separate volleys. Appellee adamantly insisted that he fired all of his shots at Fleming from the door of the bedroom across the hallway from the master bedroom. (Hayden Decl., 37, JA 518). Appellee's own expert, Matthew Noedel, however conceded that some of the shots delivered by Appellee were fired from inside the master bedroom. (Noedel Dep. 104-105). While Noedel did not identify which or how many shots were fired from inside the master bedroom, it is clear that they include the second volley of shots delivered by Appellee. This fact is also supported by the photos of the trajectory rods with Dr. Hayden placed in the bullet holes to simulate bullet paths from the master bedroom floor to the kitchen below. (JA 530-538).

This is proof that when the Appellee paused after his first volley of shots, he moved into the master bedroom and continued to fire shots at Fleming who had already fallen to the floor of the master bedroom. The testimony of Appellee that

after Fleming exited the bathroom coughing after the deployment of chemical gas, and had been shot by Moore and began falling to the floor and Appellee fired his first volleys, and fell to the floor; that Fleming had the presence of mind to be pointing the object at Appellee while trying to get up should be viewed with great skepticism, if not outright disbelief. Indeed, a rational jury could believe that the true reason that Moore fired only once was that he quickly realized as a trained police officer that Fleming did not pose a threat to him and his colleagues. For Appellee to squeeze the trigger of his weapon five times while looking at Fleming who was on the floor of the master bedroom floor is indefensible. In other words, even if one were to believe that Appellee reasonably believed that Fleming posed a threat when he fired his first volley of shots, it was unreasonable for Appellee to believe that Fleming continued to pose a threat after Fleming fell to the floor as a result of the combined effect of chemical tear gas and multiple gunshot injuries.

In *Waterman v. Batton,* 393 F.3d 471, 481 (4th Cir. 2005), this Court held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." In Waterman, the driver of a vehicle in a car chase accelerated in the direction of some police officers who then shot at him. After he had passed the officers, they continued to shoot at the driver who was later pronounced dead in hospital. This Court drew a distinction between

24

the shots which were fired by the officers while the vehicle of the suspect was speeding in the direction of the officers, and the shots which were fired after the vehicle had passed the officers. *Brockington v. Boykins,* 637 F.3d 503 (4th Cir. 2011) is similar to this case in many respects. *Brockington* who was unarmed at the time of his encounter with the police was indicted and, after a jury trial, was convicted of kidnapping, conspiracy to kidnap, carjacking, and robbery, *but was acquitted of all gun-related offenses. Brockington* subsequently filed a 42 U.S.C. §1983 action alleging the use of excessive force in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution. After a jury trial with a verdict in his favor, the district court granted judgment in favor of *Brockington* and, on appeal, the Fourth Circuit affirmed.

Unlike the plaintiff in *Brockington*, Fleming was not even indicted, let alone convicted of any crime involving the use of gun. The constitutional presumption of innocence until proven guilty which inures to Fleming's benefit, does not dissipate simply because Fleming is now deceased and can no longer speak for himself. One comment on the language of the police is appropriate here. It is remarkable that the police claimed that Fleming had told an unidentified person that he was going to go out in a "blaze of glory." (Detective Prendergast's statement p. 6). This was the identical statement made by the victim in *Pethel v. West Virginia*, 568 F. Supp.2d

658 (N.D.W.Va. 2008). Is the police making this up or do they want the court to believe that the little educated Fleming used this expression.

## POINT II

### Appellee is Not Entitled to Qualified Immunity

**Standard of Review for Qualified Immunity Determination**

This Court reviews qualified immunity determinations *de novo. See United States v. Wilhem*, 80 F.3d 116, 118 (4th Cir. 1996); *Wilson v. Kittoe,* 337 F.3d 392, 397 (4th Cir. 2003).

Appellee is not entitled to qualified immunity on the facts of this case. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court stated that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" *Id* at 818. *See also Taylor v. Farmer*, 13 F.3d 117, 120 (4th Cir. 1993) ("The Supreme Court's decisions place a special emphasis on the reasonableness of an officer's actions, requiring courts to make an objective inquiry into the facts facing the officer at the time of the alleged improper act.")

In making this *objective inquiry* into the facts facing the officer at the time of

the shooting, this Court does not have to accept hook, line and sinker, Appellee's version that Fleming was pointing a black shoe wrapped in cloth to look like a handgun at him and his fellow officers, and that he feared for his life. This is especially so when that assertion is flatly contradicted by *circumstantial evidence* in the record. The testimonies of the other police eyewitnesses – Hayes, Musselwhite, McQuail and Moore – on what was in Fleming's hand or immediate vicinity as soon as the shooting stopped is very critical. As Arrest Team members who secured Fleming by handcuffing him as soon as the shooting ended, were in the best position to observe what was in his hand and his immediate vicinity before the scene could be disturbed by anyone. None of these two men observed any cloth in Fleming's hand or his immediate surrounding. Nor did they observe the presence of any lady's black high-heeled shoe.

Properly construed, circumstantial evidence can be as objective and reliable as any other evidence. See *Hopkins v. Andaya,* 958 F.2d 881 (9th Cir. 1992). Indeed, circumstantial evidence tends to be more reliable than the testimony of eyewitnesses because, while individuals may subsequently forget facts or deliberately shade their testimony, circumstantial evidence is frozen in time. There is compelling circumstantial evidence here that Fleming was not advancing quickly toward Appellee and Moore point an object at them as he exited the master bathroom after

27

the deployment of chemical tear gas.

Also critical is the fact that the shoe which was supposedly pointed at the Appellee does not have any visible sign of blood or bullet holes, which is quite remarkable given the severe gunshot injuries which Fleming sustained to both hands which were supposedly clasping the shoe during the shooting. The District Court referred to the presence of this very shoe in a photograph which was taken by the Forensic Investigation Team crime scene unit when they arrived *well after* the shooting ended. The Court inferred that it is some indication that the shoe was present in that location immediately after Fleming was shot. (Dkt. 193, p. 9, JA 1283). This inference is incorrect in light of the surrounding circumstances.

Appellee's own very expert, Matthew Noedel, conceded that if investigators "wanted to know the involvement or lack of involvement of that shoe [black high-heeled lady's shoe alleged to have been pointed at Appellee by Fleming] then it should have been examined." (Noedel Dep. 164: ln 11-23, JA 1141). Some of the obvious testing would have included: a) testing for Fleming's fingerprints on the shoe; b) examining for bullet holes, given the gunshot injuries to Fleming's hands; c) testing for Fleming's blood in light of the very severe bleeding; and d) testing for gun powder residue. No videotapes or audiotapes of any aspect of their encounter with Fleming is in the record.

28

It is undisputed that neither Hayes nor Musselwhite mentioned the presence of this shoe on the master bedroom floor in their respective statements to police investigators on the night of the shooting. It is equally undisputed that Hayes and Musselwhite took the injured Fleming down to the ambulance waiting outside while Appellee and the rest of the SWAT team were still inside Appellant's home. By then, Appellee and his fellow SWAT colleagues already knew that Fleming was unarmed. It is further not disputed that the RPD which took the photo which the District Court referred to did not arrive for their investigation of the scene until much later after Fleming had been transported to the hospital. By their own admission, Appellee and his SWAT team mates were walking all over the scene before the arrival of the RPD Crime Scene Unit. Therefore, Appellee and the rest of the SWAT had both the motive and the opportunity to stage the scene by introducing this shoe which the photograph shows.

As further consideration of the qualified immunity claim by the defendants, it is not disputed that as of June 14, 2010, it was clearly established that the shooting of an unarmed person without justification is a violation of that person's right under the Fourth Amendment. Secondly, a reasonable police officer in Bevington's shoes could not have believed that the shooting of Fleming under the circumstance was lawful. The only test done on the grey t-shirt wrapper was to determine the presence

of gunshot residue. Based upon the lack of any evidence that this t-shirt had Fleming's blood or DNA on it, there is no evidence that it was ever wrapped around Fleming's hand. Moreover, the t-shirt could have been present on the floor of the master bedroom where it was stricken by one or more of the two bullets which missed Fleming and penetrated the bedroom floor.

While in most qualified immunity cases the facts which underlie the defense are <u>undisputed, in this</u> case, whether Fleming was pointing an object at the officers, as claimed by them, is inconsistent with the contemporaneous record of events and, therefore, seriously contested. And when the facts are disputed, as they are in this case, and the resolution of those facts turns on the credibility of the witnesses, defendants must fail. This is because for summary judgment purposes the disputed material facts must be resolved in favor of plaintiff as the nonmoving party.

What Bevington, as an individual, *perceived* is irrelevant to the objective reasonableness analysis of his conduct for qualified immunity purposes. What matters is "as a police officer acting reasonably under the circumstances should have perceived it." *See Sevigny v. Dicksey,* 846 F.2d 953, at 957 (4th Cir. 1988).

Under the totality of the circumstances analysis, and based upon his own admission of what he observed about Fleming's 'weapon', Bevington belief, particularly after his first volley of shots, that Fleming was armed and dangerous is

30

unreasonable and unworthy of belief. Bevington is not entitled to qualified immunity because a resolution of the factual disputes in the light most favorable to the Appellant would not permit same.

## **CONCLUSION**

For the foregoing reasons, this Court should allow the appeal, set aside the judgment of the District Court, and remand the case for trial on the merits.

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 34( c), Appellant respectfully requests oral argument. This case presents novel issue and will impact the rights of persons lawfully present in their homes when police enter uninvited and are killed in an ensuing encounter with the police, and the only eyewitnesses to the encounter are the police who did the killing.

Dated July 15, 2015.

Respectfully submitted,

By: /s/ John B. Mann                            K. C. Okoli
John B. Mann                                    Law Offices of K. C. Okoli, P.C.
John B. Mann, P.C.                              330 Seventh Avenue, 15th Floor
2201 Libbie Avenue, Suite 200                   New York, New York 10001
Richmond, VA    23230                           212-564-8152 - Telephone
Telephone: 804-673-6600                         212-268-3443 - Facsimile
Facsimile: 804-673-6604                         kcokoli@verizon.net
*Attorney for Plaintiff-Appellant*              *Attorney for Plaintiff-Appellant*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)

(7)(B) because this brief contains <u>6,953</u> words, excluding the parts of the brief

exempted by Fed. R. App. P. 32 (a) (7) (B) (iii).

Dated:        July 15, 2015

_/s/_____

John B. Mann, Esq.

**On the Brief:**
John B. Mann, Esq.
K.C. Okoli, Esq.

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Rule 25 of the Rules of the United States Court of Appeals for the Fourth Circuit, I hereby certify that I have this July 15, 2015, filed the required copies of the foregoing Brief of Appellant in the Office of the Clerk of the Court, via hand delivery and have electronically filed the Brief of Appellant using the Court's CM/ECF system which will send notification of such filing to the following counsel:

Donald Cameron Beck, Jr.
Antoinette Morgan Walker
MORRIS & MORRIS
5th Floor
11 South 12th Street
P. O. Box 30
Richmond, VA 23218
Email: cbeck@morrismorris.com
Email: amorgan@morrismorris.com

/s/_____
John B. Mann, Esq.

33